DON G. ANGELL; D. GRAY ANGELL, )
JR. and DON R. HOUSE, in their )
capacities as Co-Trustees of )
the DON ANGELL IRREVOCABLE )
TRUST UNDER INSTRUMENT DATED )
JULY 24, 1992; and ANGELL CARE )
INCORPORATED, )
                               )
    Plaintiffs, )
                               )
    v. )          1:01CV00435
                               )
ELIZABETH B. KELLY, C. TAYLOR )
PICKETT, and DANIEL J. BOOTH, )
                               )
    Defendants. )

<u>MEMORANDUM OPINION</u>

OSTEEN, District Judge

      Plaintiffs Don G. Angell, D. Gray Angell, Jr., and Don R.
House, in their capacities as co-trustees of the Don Angell
Irrevocable Trust Under Instrument Dated July 24, 1992, and
Angell Care Inc. filed this action against Defendants Elizabeth
B. Kelly, C. Taylor Pickett, and Daniel J. Booth (collectively,
"Defendants") alleging fraud, negligent misrepresentation, and
unfair trade practices.  Pending before this court are several
motions.  First is a joint motion for summary judgment by
Defendants.  Further motions from Defendants seek to exclude
certain affidavits from Plaintiffs' brief in opposition to
summary judgment.  For the reasons stated below, the court will

grant Defendants' joint motion for summary judgment and deny
Defendants' remaining motions as moot.

## I.    FACTUAL BACKGROUND

Defendants are all former officers of Integrated Health
Services, Inc. ("IHS").  Plaintiffs are former creditors of
Premiere Associates, Inc. ("Premiere").  During the various
transactions that this opinion will describe, IHS acquired
Premiere through a stock buyout, which generated Plaintiffs'
claims.

Don G. Angell ("Angell") is a businessman who has operated
various businesses through The Angell Group, Inc. (a holding
company).  Angell used experienced attorneys in the two
transactions discussed in this opinion.  Angell, along with the
other Plaintiffs, had owned and operated various skilled nursing
facilities through their various subsidiaries.  During late 1994,
Plaintiffs sold the stock of some of their subsidiaries to
Premiere, a corporation which Vernon Herzog ("Herzog") and
Stewart Swain ("Swain") formed.

Plaintiffs financed Premiere's purchase of the subsidiaries
by lending Premiere money.  Premiere executed promissory notes to
Plaintiffs in an amount equal to the loan.  Plaintiffs secured
repayment of the notes with (1) Premiere shareholders' pledge of
their Premiere stock; (2) Premiere's pledge of Premiere's
subsidiaries' stock; and (3) Herzog's and Swain's, Premiere's
principal shareholders, personal guaranties on the loan from
Plaintiffs to Premiere.  Thus, as to the Premiere stock and its

2

subsidiaries' stock, Plaintiff held a security interest in that stock ("the encumbered stock").

The parties memorialized this transaction ("the 1994 transaction") with a loan agreement between Plaintiffs and Premiere. In that loan agreement, sections 3.02 and 4.05(b) restricted Premiere's right to pledge the encumbered stock. Under section 3.02,

> [n]o assignment, pledge, chattel mortgage, bill of sale, security agreement, financing statement[,] or other lien or encumbrance has been or will be executed by [Premiere] with respect to the [s]tock other than to [Plaintiffs]. The loan on the [s]tock created by the [s]ecurity [i]nstrument shall be a perfected first lien priority security interest subject only to [several inapplicable exceptions] . . . .

(Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 41 at 5.) Under section 4.05(b), Premiere could not "[c]reate any encumbrance, lien[,] or security interest in any of the [s]tock." (Id. Ex. 41 at 8.)

In 1997, Premiere's shareholders initiated the sale of Premiere's and its subsidiaries' stock (including the encumbered stock) to IHS. This transaction closed on June 25, 1998 ("the 1998 transaction"). In this transaction, Defendants claim IHS received the encumbered stock free and clear of any security interests, including all interests that the 1994 transaction created.

In the 1998 transaction, Plaintiffs agreed to exercise any stock options they held in Premiere and its subsidiaries and then transfer all those shares plus the shares they already owned in

3

those same entities to IHS "free and clear of all liens, claims, security interests, mortgages, pledges, charges, easements, rights of set off, restraints on transfers, restrictions on use, options, or encumbrances of any kind or nature whatsoever." (Br. Supp. Defs.' Mot. Summ. J. Ex. 10 at 3.) In exchange, IHS (1) promised not to prepay, for three years, the promissory notes that the encumbered stock secured and (2) executed a guaranty for those same notes.

Several documents set the terms of the 1998 transaction, including (1) a merger agreement between Premiere and IHS; (2) an agreement among IHS, Premiere, and Plaintiffs ("the Angell Agreement");[1] (3) an amendment to the 1994 loan agreement ("amended 1994 loan agreement"); and (4) guaranties from IHS to Plaintiffs. In the Angell Agreement, it was "a condition to the . . . [c]losing that all of the [s]hareholders' Premiere [stock] be released from the Angell Pledge."[2] (Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 43 at 2.) This agreement also noted the 1994 loan agreement's existence and stated Plaintiffs were

_____

[1] The Angell Agreement was necessary because, even though the 1998 transaction was between IHS and Premiere, Plaintiffs held security interests, which the 1994 transaction created, in the stock. Since part of the 1998 transaction would release those security interests, Defendants had to secure agreements from Plaintiffs.

[2] The "Angell Pledge" was the 1994 transaction described above, where "the Premiere Shareholders ha[d] pledged all of the Shareholders' Premiere Shares to various members of the Angell Group to secure repayment of the . . . notes." (Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 43 at 1.)

4

"willing to release Premiere and its subsidiaries from" Article

IV of that loan agreement. (Id.) Furthermore,

> [s]ubject to the terms and conditions of th[e] [Angell]
> Agreement and the . . . Merger Agreement, at the
> Premiere Closing, [IHS] [was to] acquire, through the
> [m]erger, from [Plaintiffs] . . . all of the Angell
> Shares[, the stock of Premiere and its subsidiaries],
> free and clear of all liens, claims, security
> interests, mortgages, pledges, charges, easements,
> rights of set off, restraints on transfers,
> restrictions on use, options, or encumbrances of any
> kind or nature whatsoever ("Liens").

(Id. Ex. 43 at 3.) The Angell Agreement's section 1.5 provided

that a separate agreement ("the Release Agreement") would

terminate the security interest.[3]

This contract also contained several warranties made by IHS.

The following describes the important warranties:

> 1. Section 6.4: IHS "has furnished [Plaintiffs] . . .
>    with a correct and complete copy" of all SEC documents
>    from a certain date. (Id. Ex. 43 at 11.)

---

[3] Subject to the terms and conditions of this
[a]greement, at the Closing: (a) each of
[Plaintiffs] . . . shall release, <u>pursuant to
a release agreement</u> . . . in form and
substance reasonably acceptable to
[Defendants] and [Plaintiffs'] . . .
[r]epresentative, all of the Shareholders'
Premiere Shares from the Angell Pledge and
any other Liens that any Angell Group Member
may have on, in or to any of the
Shareholders' Premiere Shares or any of the
assets of Premiere of any of its
subsidiaries; (b) the Angell Pledge Agreement
shall be terminated; and (c) Premiere and its
subsidiaries shall be released from all of
the [c]ovenants.

(Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 43 at 3 (emphasis
added).)

2. Section 6.5: Entering this agreement did not violate, among other requirements, any of IHS's presently existing obligations. (<u>Id.</u>)

3. Section 6.7: Since September 30, 1997, except as provided on an attachment or in the SEC documents Defendants were to provide, no "material adverse change" in IHS's "condition or prospects" of its "assets, properties[,] or operations" had occurred. (<u>Id.</u> Ex. 43 at 12.)

Consistent with the Angell Agreement, the parties executed the Release Agreement to define the terms of releasing the stock from Plaintiffs' security interests (formed under the 1994 transaction). The Release Agreement noted that "[a]s a condition to consummation of the [m]erger . . ., I[HS] has required that [Plaintiffs] release [their] security interest in the [s]tock and . . . release the [s]hareholders from all liability under the [g]uaranty." (Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 45 at 1.) Thus, the parties purportedly released all security interests created under the 1994 transaction.

The parties also created the amended 1994 loan agreement. The 1994 transaction's loan agreement limited the right to "[c]reate any encumbrance, lien[,] or security interest in any of the [s]tock." (Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 41 at 8.) The parties specifically deleted this right when they executed the amendment. (<u>Id.</u> Ex. 42 at 2.) However, the amended 1994 loan agreement still stated that "[n]o assignment, pledge, chattel mortgage, bill of sale, security agreement, financing statement[,] or other lien or encumbrance has been or will be executed by [Premiere] with respect to the [s]tock other than to [Plaintiffs]." (<u>Id.</u> Ex. 41 at 5; <u>see</u> <u>id.</u> Ex. 42.) Thus, in

6

spite of the language, in various agreements, saying that the stock transferred free and clear of restrictions, the amended 1994 loan agreement still restricted stock transfers.

Defendants, on IHS's behalf, also issued a guaranty to Plaintiffs.  In that guaranty, Defendants agreed that

> [u]pon an Event of Default after notice and the expiration of appropriate cure periods, any indebtedness, fee[,] or other obligation of . . . [Premiere] to . . . [IHS] now or hereafter existing, together with any interest thereon, shall be, and each such indebtedness, fee[,] or other obligation is hereby deferred, postponed[,] and subordinated to the repayment of the [i]ndebtedness.

(Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. Ex. 44 at 3.)  Thus, if IHS defaulted on the obligation to Plaintiffs, then that obligation was to be superior to any obligations from IHS to Premiere.

Plaintiffs' fraud claims derive from these contractual obligations.  Plaintiffs first claim that Defendants knew of several outstanding obligations of IHS that conflicted with their representations when they closed the 1998 transaction.  First, IHS owed a significant amount of money to Citibank, a loan memorialized in a "Credit Facility."  Under that Credit Facility, Defendants had to pledge stock from IHS's subsidiaries to Citibank and extract guaranties for that loan from any subsidiary.  Thus, pursuant to the Credit Facility, "Defendants knew that, immediately following the merger, they would cause Premiere to assume the $2 Billion debt obligation of IHS under its senior Credit Facility [by way of a guaranty between Premiere and Citibank] and pledge the Premiere Stock to Citibank."  (Pls.'

7

Br. Opp'n Defs.' Joint Mot. Summ. J. at 8.) Accordingly, once
IHS and Premiere merged, Defendants pledged Premiere's [s]tock to
Citibank and "obligated Premiere, worth approximately $50
Million, to . . . assume the full $2 Billion obligation of IHS
under the Credit Facility." (<u>Id.</u>) Plaintiffs claim this
violated Defendants' representations under both the amended 1994
loan agreement (because that document "prohibited the pledge of
the Premiere [s]tock to anyone other than [Plaintiffs]") and
under the IHS guaranty to Plaintiffs (because it "subordinated
all obligations of Premiere to IHS to the full payment of the
Angell Notes").[4] (<u>Id.</u> at 9.) Plaintiffs allege the Credit
Facility violates the Angell Agreement's section 6.5, which was
described above.

   Plaintiffs next claim Defendants failed to disclose
information they possessed that related to Defendants'
termination of parts of IHS's home healthcare business.
Plaintiffs argue that

> Defendants misrepresented [that] there had been no
> material adverse change [(section 6.7's warranty)] in
> the condition or prospects of IHS and its subsidiaries,
> despite actual knowledge of such changes due to
> dramatic Medicare reimbursement cuts that were
> affecting the operations of IHS's home nursing business
> and that led IHS, shortly after the closing [of the
> 1998 transaction], to . . . disclose [publicly] . . .
> that it was considering the discontinuation of that
> business.

---

[4] Implicit in this argument is <u>Premiere's</u> guaranty to
<u>Citibank</u> is actually an <u>IHS-Premiere obligation</u> under the IHS
guaranty with Plaintiffs even though the Premiere-Citibank
guaranty is a contract between Premiere and Citibank with IHS as
a probable third-party beneficiary.

(Id.)  The dramatic Medicare reimbursement cuts were to come from
Congress under the Balanced Budget Act of 1997 ("BBA").
Plaintiffs relied on these alleged misrepresentations and
released their security interests in the Premiere stock.
Plaintiffs allege they would not have otherwise closed on the
transactions.

Plaintiffs finally claim Defendants misrepresented their
section 6.4 warranty by not supplying them with all of IHS's
relevant SEC documents.  Plaintiffs, however, were aware that
Defendants had not sent them all documents at closing but closed
anyway, without conducting any independent inquiry into IHS's
financial background.  Plaintiffs received some documents, but
none of them disclosed the Credit Facility or the BBA's possible
effects.  Plaintiffs argue that the other SEC documents would not
have revealed the Credit Facility or the BBA's possible effects,
though Defendants argue they fully publicly disclosed all
information on these topics in their SEC documents.

**II.  STANDARD OF REVIEW**

Summary judgment is appropriate where an examination of the
pleadings, affidavits, and other proper discovery materials
before the court demonstrates that no genuine issues of material
facts exist, thus entitling the moving party to judgment as a
matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477
U.S. 317, 322-23, 106 S. Ct. 2548, 2552 (1986).  If the moving
party has met that burden, then the nonmoving party must persuade
the court that a genuine issue does not remain for trial.

9

> When the moving party has carried its burden under Rule
> 56©, its opponent must do more than simply show that
> there is some metaphysical doubt as to the material
> facts.  In the language of the Rule, the nonmoving
> party must come forward with "specific facts showing
> that there is a <u>genuine issue for trial</u>."

<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
586–87, 106 S. Ct. 1348, 1356 (1986) (citations & footnote
omitted) (quoting Fed. R. Civ. P. 56).  The court must view the
facts in the light most favorable to the nonmovant, drawing
inferences favorable to that party if such inferences are
reasonable.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255,
106 S. Ct. 2505, 2513 (1986).  However, there must be more than a
factual dispute; the fact in question must be material, and the
dispute must be genuine.  Fed. R. Civ. P. 56; <u>Anderson</u>, 477 U.S.
at 248, 106 S. Ct. at 2510.  A dispute is only "genuine" if "the
evidence is such that a reasonable jury could return a verdict
for the nonmoving party."  477 U.S. at 248, 106 S. Ct. at 2510.

## III. ANALYSIS

A.   Plaintiffs' Fraud Claims

In North Carolina,

> [t]he essential elements of the tort of fraud are as
> follows:  (1) material misrepresentation of a past or
> existing fact; (2) the representation must be definite
> and specific; (3) made with knowledge of its falsity or
> in culpable ignorance of its truth; (4) that the
> misrepresentation was made with intention that it
> should be acted upon; (5) that the recipient of the
> misrepresentation reasonably relied upon it and acted
> upon it; and (6) that [thereby] resulted in damage to
> the injured party.

<u>Volumetrics Medical Imaging, Inc. v. ATL Ultrasound, Inc.</u>, 243 F.
Supp. 2d 386, 414 (M.D.N.C. 2003) (alterations in original)

(quoting <u>Horack v. Southern Real Estate Co. of Charlotte</u>, 563 S.E.2d 47, 53 (N.C. Ct. App. 2002)). Plaintiffs base their claim for fraud on the following alleged misrepresentation and nondisclosures: (1) Defendants' nondisclosure of the Credit Facility with Citibank and representations that the 1998 agreement did not conflict with other agreements to which they were parties; (2) Defendants' nondisclosure of the BBA's possible effect on IHS and representation that no material adverse changes in IHS's prospects or conditions had occurred; (3) Defendants' misrepresentation that Premiere would continue to pay the Angell Notes;[5] (4) Defendants' misrepresentation that IHS would guarantee, above other obligations, the obligations of Premiere under the Angell Notes and the Loan Agreement; and (5) Defendants' misrepresentation that Plaintiffs' rights would be senior to any Premiere-IHS obligations, existing or after-acquired. Defendants argue Plaintiffs' fraud action fails as a matter of law because (1) Plaintiffs cannot show concealment of a material fact; (2) Plaintiffs cannot show justifiable reliance; (3) Plaintiffs cannot show any intent to deceive; (4) Plaintiffs cannot show causal links between Defendants' conduct and Plaintiffs' losses; and (5) Plaintiffs elected a contractual remedy (in a prior bankruptcy action) that should bar this fraud-based action. Because the court will find a lack of justifiable

---

[5] Plaintiffs do not present argument on this point. The court, because of the lack of argument, finds that Plaintiffs abandoned this point as a possible misrepresentation.

reliance as a matter of law, analysis of the remaining arguments
is unnecessary.

Plaintiffs fail to establish reasonable reliance as a matter
of law. In North Carolina, a plaintiff must show that he
reasonably relied on a defendant's representations. "When the
parties deal at arms length and the p[arty] has full opportunity
to make inquiry but neglects to do so . . ., action in deceit
will not lie" except under specific fact situations. Calloway v.
Wyatt, 97 S.E.2d 881, 885-86 (N.C. 1957). A plaintiff must make
reasonable inquiry even when the defendant makes specific
"representations as to . . . condition, quality[,] or character."
Id. (holding that a plaintiff unreasonably relied on a
defendant's representations that a well had plenty of water, when
the plaintiff knew groundwater shortages existed in the area,
because the plaintiff failed to exercise "ordinary prudence" by
conducting "some investigation") (quoting Harding v. Southern
Loan & Ins. Co., 10 S.E.2d 599, 602 (N.C. 1940)). "The
reasonableness of a party's reliance is a question for the jury,
unless the facts are so clear that they support only one
conclusion." State Props., LLC v. Ray, 574 S.E.2d 180, 186 (N.C.
Ct. App. 2002). North Carolina's rationale for requiring
reasonable inquiry is that the courts must "suppress [a
defendant's] fraud and also . . . discourage negligence on the
part of [a plaintiff]." Leake v. Sunbelt Ltd. of Raleigh, 377
S.E.2d 285, 288 (N.C. Ct. App. 1989).

Consistent with a plaintiff's duties to conduct reasonable inquiry, a plaintiff can rely a defendant's representation when the defendant has superior access to the information that would reveal the representation's falsity. "Superior access" means the investigating party "would not have discovered [such information] during his own investigation." Freese v. Smith, 428 S.E.2d 841, 846–47 (N.C. Ct. App. 1993); cf. Leake, 377 S.E.2d at 288 (holding that summary judgment was not appropriate for a fraud-based claim when the truth-revealing information was "not easily found in even a diligent . . . examination"). Thus, to show the plaintiff did not reasonably rely on the false assertion because he had access to truth-revealing information, the plaintiff must be able, reasonably, to find the information, in addition to such information actually revealing the falsity of the defendant's claim.

Furthermore, an exception to the rule exists. A defendant can be liable for a fraudulent statement's harm, even when a plaintiff could determine the falsity on his own, if he induces the plaintiff to forgo independent investigation. Thus, when a defendant "resort[s] to [an] artifice . . . reasonably calculated to induce the purchaser to forgo investigation," a plaintiff's reliance may still be reasonable. Calloway, 97 S.E.2d at 885–86. The court examines how the reasonable person would act toward the defendant's representations and his other acts under similar facts. See Bolick v. Townsend Co., 381 S.E.2d 175, 178 (N.C. Ct. App. 1989). A mere representation by itself can be "reasonably

13

calculated" to induce forbearance.  For example, in <u>Bolick</u>, the North Carolina Court of Appeals found reasonable reliance on a representation that real property was suitable for a septic tank system because, even though reasonable inspection would show otherwise, the defendant falsely and specifically "represent[ed] that an employee of the County's Environmental Health Department had specifically approved the installation of a septic tank system [and] . . . gave the employee's name as well as the date [of] the contact."  <u>Id.</u>  Such a specific and detailed representation would logically and reasonably justify a plaintiff's forbearance from further inquiry.  <u>Id.</u>  In <u>Davis v. Sellers</u>, 443 S.E.2d 879 (N.C. Ct. App. 1994), the North Carolina Court of Appeals held that a defendant's answering "no" to the plaintiff's specific question about the house having flooding problems was reasonably sufficient to induce forbearance from "further inquiry [that the plaintiff] . . . otherwise would have made."  <u>Id.</u> at 885.

In determining the representation's nature to induce forbearance, the court may consider other facts that qualified the defendant's representation, even in spite of what the plaintiff did or could have reasonably known.  <u>See, e.g.</u>, <u>Blanchfield v. Soden</u>, 381 S.E.2d 863, 864-65 (N.C. Ct. App. 1989) (holding that the plaintiffs could reasonably rely upon the defendant's unqualified assertion that the roof was new, even though the plaintiffs knew the roof leaked, because the defendant's other conduct suggested the roof could be new with

14

defects rather than simply an old, deteriorated roof). Still, "only in exceptional cases [may] the issue of reasonable reliance . . . be decided by the summary judgment procedure." Northwestern Bank v. Roseman, 344 S.E.2d 120, 125 (N.C. Ct. App. 1986).

Plaintiffs argue that Defendants made representations that the loan documents did not conflict with any prior agreements Defendants had.[6] Defendants, moreover, represented that "there had been no material adverse change in the condition or prospects of IHS and its subsidiaries other than as set forth in the SEC Documents actually delivered to Angell or on Schedule 6.7 of the Angell Agreement." (Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. at 16 (footnote omitted).) Plaintiffs further argue their reliance was reasonable because they "obtain[ed] affirmative representations from IHS, [and thus] . . . perform[ed] due

---

[6] Plaintiffs' argument in a nutshell is as follows:

> Defendants promised that (1) Premiere would continue to pay the Angell Notes, (2) IHS would guarantee Premiere's performance of all obligations under the Angell Notes and Loan Agreement, and (3) Angell would have priority over all other obligations of Premiere to IHS. Angell reasonably relied on Defendants' specific representations in the Angell Agreement and [t]ransaction [d]ocuments that (1) the execution and delivery of the transaction documents would not conflict with any material agreement to which IHS was a party and (2) there had been no material adverse change in the condition or prospects (financial or otherwise) of the assets, properties[,] or operations of IHS and its subsidiaries.

(Pls.' Br. Opp'n Defs.' Joint Mot. Summ. J. at 21–22.)

15

diligence." (Id. at 17.) Defendants' written representations would lead a reasonable person "not to conduct further inquiry into IHS's financial condition because the affirmative nature of the representations led [Angell] to believe he could rely on the promises made to him." (Id. at 18.)

Plaintiffs further argue that they performed other due diligence. After special requests, Plaintiff's attorney received IHS's 1996 10-K, June 20, 1997, and October 21, 1997, proxy statements, and a March 4, 1998, press release touting IHS's 1997 successes and not mentioning any problems from the BBA. Defendants, furthermore, never sent IHS's 1997 8-K that described the Credit Facility with Citibank and the 1998 SEC documents that referred to IHS's home nursing business and the BBA's possible effects. Implicitly, Plaintiffs argue that finding such documents in conducting their own inquiry would have been unreasonable under these facts.

Finally, Plaintiffs argue that examining these documents would not have revealed these assertions to be false. Even if they saw the Credit Facility's disclosure in the SEC documents, Plaintiffs could have reasonably believed Citibank consented to this transaction, which means Plaintiffs' knowledge of IHS's Credit Facility by itself reasonably suggests that Citibank consented to be junior to the 1998 agreement. Also, the SEC documents "contained no information about the actual reimbursement cuts [under the BBA] even though similar companies were disclosing such information." (Id. at 21.)

16

1. The Truth-Revealing Information Was Readily
   Available to Plaintiffs

Defendants publicly disclosed the possibly conflicting
Credit Facility.  Plaintiffs do not dispute that they could have
discovered the existence of Credit Facility in publicly available
documents.  Plaintiffs also point to nothing showing that they
could have reasonably thought Citibank approved the 1998
transaction and would subordinate to obligations created by that
agreement.  If Plaintiffs knew of the Credit Facility and thought
it could be inconsistent with Defendants' obligation under the
1998 transaction, Plaintiffs should have at least contacted
Defendants for some explanation (and possibly further, more
reliable representations).  Under these facts, Plaintiffs did
nothing.  It would be unreasonable to simply turn a blind eye and
assume Citibank consented to the transaction and agreed to
subordinate to IHS's obligations to Plaintiffs.

Furthermore, IHS's SEC documents do show Defendants publicly
stated that possible legislation, especially the BBA, could
render some of its services' futures uncertain.  For example,
IHS's Form 10-K for the 1997 fiscal year, filed prior to closing,
stated the BBA "makes numerous changes to the Medicare and
Medicaid programs that could significantly affect the delivery of
subacute care, skilled nursing facility care[,] and homehealth
care."  (Br. Supp. Defs.' Mot. Summ. J. Ex. 7 at 3.)  More
specifically, "[t]he inability of IHS to provide home healthcare
. . . at a cost below the [BBA's] established Medicare fee
schedule could have a material adverse effect on IHS'[s] home

healthcare operations, post-acute care network[,] and business generally." (Id. Ex. 7 at 11-12; accord id. Ex. 7 at 15 ("Such changes [that the BBA requires] could have a material adverse effect on the Company and its growth strategy. . . . The inability of IHS to provide home healthcare services at a cost below the established Medicare fee schedule could have a material adverse effect on the Company's home healthcare operations and its post-acute care network.").) Contrary to Plaintiffs' description, the SEC documents clearly show that IHS disclosed publicly that the BBA could have severe, adverse effects on its home healthcare business.

Further, Plaintiffs closed on the transaction knowing they had not received all the SEC documents and sought neither the documents themselves nor further assurances from Defendants, for example, that the remaining documents were unimportant. Both parties were sophisticated, business parties who had legal counsel in the relevant transactions, which occurred at arm's length. The truth-revealing documents were publicly available, and a reasonably diligent bargaining party would have found and read these publicly available SEC filings (even if they had to obtain them on their own) before consummating the transaction. This simply is not a case where the falsity of Defendants' representations is obscure or available only to the other, superior bargaining party. Defendants made generic representations as to conflicting obligations and delivery of SEC

18

documents, but information showing those representations to be false or qualified was otherwise easily available to Plaintiffs.

2.    No Facts Excused Plaintiffs' Own Inquiry

Moreover, Plaintiffs do not show reasonable forbearance from diligent inquiry.  Plaintiffs argue Defendants' representations to disclose certain matters excused Plaintiffs' own independent inquiry.  However, the mere fact a defendant made a representation in writing is not sufficient in all cases to show reasonable reliance.  A party can, of course, reasonably rely on unqualified representations made in some factual settings, see Tyson Foods, Inc. v. Ammons, 331 S.E.2d 208, 210-11 (N.C. Ct. App. 1985), but even when a warranting party makes certain representations, "[t]he right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him," Goff v. Frank A. Ward Realty & Ins. Co., 203 S.E.2d 65, 68 (N.C. Ct. App. 1974) (quoting Calloway, 97 S.E.2d at 886).  In spite of these warranties, nothing in these facts relieved Plaintiffs, as sophisticated business parties, from doing their own review of publicly available documents, especially since they knew Defendants had not delivered all SEC documents as promised.

Defendants' conduct should have "naturally . . . arouse[d] the suspicion of the plaintiffs that the representations were false." Calloway, 97 S.E.2d at 886 (holding that facts showing a representation to be possibly false must prompt at least "some investigation").  Plaintiffs needed to exercise at least "the

19

slightest diligence to ascertain this question themselves . . .
[unless] prevented from doing so by any artifice of the seller."
Id. (quoting Hays v. McGinness, 67 S.E.2d 720, 720 (Ga. 1951)).
Without such artifice, and even if such research and review were
cursory,[7] Plaintiffs would have seen possible conflicting
obligations and information (which should have prompted further
inquiry and possibly further, more specific, and more reliable
representations). Plaintiffs' reliance is an "extraordinary"
situation and unreasonable as a matter of law.

_____

[7] This court expresses no view on what would have been a
reasonable inquiry. Reasonableness is usually a jury question,
except when "the facts are so clear that they support only one
conclusion," which is usually the case when "a plaintiff fails to
make any independent investigation." State Props., LLC v. Ray,
574 S.E.2d 180, 186 (N.C. Ct. App. 2002).

Case 1:01-cv-00435-WLO   Document 156   Filed 11/30/06   Page 20 of 24

B.   Plaintiffs' Negligent Misrepresentation Claims

"The tort of negligent misrepresentation occurs when [(1)] a
party justifiably relies [(2)] to his detriment [(3)] on
information prepared without reasonable care [(4)] by one who
owed the relying party a duty of care." Simms v. Prudential Life
Ins. Co. of Am., 537 S.E.2d 237, 240 (N.C. Ct. App. 2000)
(alterations in original) (quoting Raritan River Steel Co. v.
Cherry, Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988)).
Preparing information without reasonable care includes failing to
disclose matters when a contractual duty to disclose such
information exists. See Oberlin Capital, L.P. v. Slavin, 554
S.E.2d 840, 846 (N.C. Ct. App. 2001). Defendants assert that no
misrepresentations occurred, Plaintiffs could not reasonably rely
on the statements, and any detrimental reliance was not caused by
any of Defendants' statements. This cause of action, like the
fraud-based claims, requires justifiable reliance. This element
fails for the reasons discussed above. Plaintiffs' reliance,
under this case's specific facts, was unreasonable as a matter of
law.

C.   Plaintiffs' Unfair Competition Claim

North Carolina General Statute section 75-1.1(a) states that
"[u]nfair methods of competition in or affecting commerce, and
unfair or deceptive acts or practices in or affecting commerce,
are declared unlawful." "To prevail on a claim of unfair and
deceptive trade practice a plaintiff must show (1) an unfair or
deceptive act or practice, or an unfair method of competition,

21

(2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or to his business." Spartan Leasing Inc. v. Pollard, 400 S.E.2d 476, 482 (N.C. Ct. App. 1991). At issue are (1) whether Defendants committed an unfair act and (2) whether those acts proximately caused Plaintiffs' injury. Because the court will find that Defendants' acts were not unfair or deceptive under the statute, analysis on the other element is not necessary.

"A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981). A defendant's acts fall under section 75-1.1's scope when they "possess[] the tendency or capacity to mislead or create[] the likelihood of deception." RD&J Props. v. Lauralea-Dilton Enters., LLC, 600 S.E.2d 492, 501 (N.C. Ct. App. 2004). What acts a defendant committed is a question of fact, but whether those acts violate section 75-1.1 is a question of law. Id. "In a business context, this question is determined based on the likely effect on 'the average business person.'" Id. (quoting Bolton Corp. v. T.A. Loving Co., 380 S.E.2d 796, 808 (N.C. Ct. App. 1989)).

Plaintiffs allege that Defendants made representations in the contract as described above. Plaintiffs closed knowing they had not received all SEC documents, documents that revealed Defendants' possibly conflicting obligations with Citibank and

22

IHS's concern over the BBA. Plaintiffs chose to do no investigation on their own and did not inquire any further about where the SEC documents, which Defendants were to provide, were. Nothing in these facts is "immoral, unethical, oppressive, unscrupulous, or substantially injurious." Defendants' alleged misrepresentations, when publicly available documents show those representations to be false, are not an act "likely to deceive" the "average business person." Plaintiffs were unreasonable in relying on the representations under this case's facts. Defendants' conduct, thus, did not violate section 75-1.1.

## IV. CONCLUSION

For the reasons set forth above,

The Motion for Summary Judgment [88] of Defendants Elizabeth B. Kelly, C. Taylor Pickett, and Daniel J. Booth will be granted and Defendants' motions [103], [105], and [107] will be denied as moot.

An order and judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

This the 30th day of November 2006.

_____
United States District Judge